Ruesch, Respondent, vs. Sentinel Company, Appellant.

*March 12—April 8, 1913.*

*Master and servant: Personal injury: Negligence: Defects in elevator: Evidence.*

Plaintiff, a machinist, was injured while repairing the trap doors at the top of the shaft of an hydraulic elevator in defendant's building. He was sitting upon the floor of the elevator with his feet hanging over the edge, and the injury is alleged to have been caused by a leak in the intake valve, resulting in

abnormal, self-starting, upward movements of the elevator, whereby plaintiff's legs were caught and jammed between the elevator floor and the under side of the frame of the doors. Upon the evidence (stated in the opinion) it is *held* that there could be no reasonable inference that the movement of the elevator at the time of the accident was due to a leaky valve, and that a verdict for defendant should have been directed on the ground that no actionable negligence on its part was shown.

APPEAL from a judgment of the circuit court for Milwaukee county: F. C. ESCHWEILER, Circuit Judge. *Reversed.*

The plaintiff is a machinist, and on July 2, 1907, was employed by the defendant to make certain repairs on trap doors covering an elevator shaft located in an alley outside of defendant's building in the city of Milwaukee, which shaft extended from the basement floor of the building to the surface of the alley. When the elevator was not in use these trap doors were closed down, being so constructed as to permit teams to travel over them. A hydraulic elevator was operated from the basement floor to the surface of the alley and above it to a distance about equal to the height of an ordinary wagon. The elevator was operated by means of a cable, which when pulled down would lower the elevator and when pulled up would raise it. On the day in question the elevator was placed in such a position as to enable the plaintiff to stand or sit upon the floor thereof and work on the underside of the trap doors inside the shaft. He sat upon the floor with his feet hanging over the edge, and while in this position his legs were caught and jammed between the elevator floor and the under side of the frame to which the trap doors were fastened. This action is brought to recover damages for injuries sustained.

The complaint alleged that the elevator was out of repair and defective and had been for a long time and was known as a creeping elevator; that plaintiff had no knowledge of its

defective condition and that defendant did not advise him of it. The answer put in issue all the material allegations of the complaint. The jury returned a verdict in favor of the plaintiff, and from a judgment entered on such verdict the defendant appeals.

For the appellant there was a brief by *C. H. Van Alstine*, and oral argument by *Mr. Van Alstine* and *Mr. Charles Quarles*.

For the respondent there was a brief by *O'Connor, Schmitz & Wild*, and oral argument by *A. J. Schmitz*.

BARNES, J. The plaintiff's right to recover must be predicated on these grounds: (1) There was a leak in the intake valve of the elevator, in consequence of which plaintiff was injured. (2) The valve was defective for such a length of time that defendant was chargeable with actual or constructive notice of its condition. (3) The defendant was negligent in failing to warn the plaintiff of the defect complained of.

The evidence in behalf of the plaintiff was to the effect that while he was working on the elevator it raised by a series of short jerks of about a quarter of an inch each, and that it raised in this manner about two inches in the course of an hour. The plaintiff's father, who completed the work after his son was hurt, testified that while he was at work the elevator raised about sixteen inches in twenty minutes. Two elevator inspectors of the city of Milwaukee, Otto Fischer and George Mueller, were sworn as experts on behalf of the plaintiff. Fischer testified that the abnormal movement which took place on the morning of the accident was due to a leak in the intake valve *and could be accounted for in no other way.* He also testified that such a leak would produce the jerky motion testified to by the plaintiff and his helper, Fleck. Mueller testified that the movement was due to one

of two causes, either the valve was not closed in the first instance or else there was a leak in it.    The uncontradicted evidence also showed that the water pressure was fifty-five pounds to the square inch.

The appellant makes two contentions which go to the merits of the case.    The first is that the evidence tending to show the jerky motion is incredible because contrary to physical laws.    The argument in support of this claim is that water is practically incompressible, and that with a constant and steady pressure a leaky valve would produce a constant and steady upward movement of the elevator.    The second point made is that the evidence does not show or tend to show that the defendant had any knowledge, actual or presumed, that there was any defect in the valve prior to the time of plaintiff's injury.    If either of these contentions is decided adversely to the plaintiff, he has no cause of action because no negligence would be shown on the part of the defendant. The conclusion reached on the appellant's second contention renders any consideration of the first one unnecessary.

The elevator in question was adjacent to an alley and was intended to travel from the basement of the building to a point about three feet above the first floor.    It was used for receiving paper and other freight from trucks and lowering it into the basement, and also for the purpose of elevating cores, waste paper, etc., intended for shipment, from the basement to such a height that these articles could be conveniently loaded on trucks in the alley.    For some time before the accident one Haisler was employed by the defendant to do its trucking.    Two of the teamsters, Otto Buntrock and Herman Rauschenberger, employed by him were sworn as witnesses on the trial, and it was by their testimony the plaintiff sought to show notice of the defect in the elevator that was responsible for the injury to him.    Buntrock testified:

"Well, I used to put rolls on there and she would go way down. Took the roll off, started the elevator, she would go up about three feet and stop, then I would holler, 'What is the matter with the elevator?' . . . He would start the elevator again, she would come up, she would go up probably five inches below the wagon and stay there. The time I got started to get the rolls she was up way over the wagon. It would start by itself. I would call him and he would lower the elevator. I have noticed the elevator when it stopped three or four feet up, start by itself from that position. It would start just by jerks. It would go up from six inches to a foot and then stop by itself. I knew that pretty near all the time I was hauling there. I hauled there about eight months before plaintiff was hurt. I went there two or three times a week. The elevator did not act that way every time, but it did most of the time. I have seen the elevator stay there some time about ten minutes and then come up. Never saw it stay that way hardly an hour though and then come up. I have seen it jump up from six inches to a foot. It would not do all that in one jump, but it would be about two or three jumps."

This witness also testified that after the elevator came to a stop it would not start until the elevator man, who worked in the basement and did not ride on the elevator, started it again, and he also testified that it would. He also testified that the elevator would not go down of its own motion after a load was placed upon it. He knew the elevator started by itself because "he started and stopped and it started by itself." Could not see the elevator man after he started the elevator. Did not see the elevator move unless someone started it, for two or three weeks before the accident. The elevator was brought to the level of the wagon when freight was to be unloaded on it. It was put there by Billy Seyfried.

"*Q.* You also testified that when the elevator was placed that it had moved up some inches above the level of the wagon? *A.* Yes, sir. *Q.* Now will you state how often that happened? *A.* Well, I couldn't hardly do that."

Rauschenberger testified:

"When I took goods there to be unloaded the elevator was operated by a man by the name of Seyfried. The way he would bring it up, he would start it and let it go. At times it would come right straight up, and at other times she would come up part ways and she would stop. She would, you might say, practically come to a stop and she would start and go away.

"Q. How would it start again away, by somebody starting it or what? A. No, sir, she would start by itself.

"Q. Did you ever speak to Mr. Seyfried, the elevator man, about it? A. Yes, sir.

"It was several months prior to the accident that I first noticed that the elevator after it was started would come up and stop and then start again. It didn't do that every time, but it was most every time. I couldn't say that I ever saw it start of itself until it had first been started. As to how far up it would go when it started of itself, she would act different at different times. Sometimes she would start up and she would go probably about six or eight inches and she would stop, and other times she would get started and go with a jerk and go right straight up, but I have seen it go up five or six inches and then stop and then start again and come up five or six inches. Sometimes she would go further and sometimes she would go clear up."

It appears directly from the evidence of this witness and inferentially from that of Buntrock that Seyfried, the elevator man, worked in the basement taking care of the rolls of paper as they were lowered, and that he simply pulled the rope or chain in the basement whenever he desired to move the elevator up or down. Mr. Rauschenberger also testified that he did not know whether the elevator acted abnormally during the month of June or not. Plaintiff was hurt on July 2d.

The following hypothetical question, based on the evidence of Buntrock and Rauschenberger, was propounded to the expert Fischer:

*Q.* Mr. Fischer, assuming that an elevator—hydraulic elevator such as you examined at the Sentinel alley is started upward by an operator and after having gone up part ways stops by itself and then again starts upward by itself. What in your judgment and opinion was the cause of such second upward movement?"

To which the following answer was given:

"There is quite a few causes. One cause is the controlling system might be so that the valve—the controlling system could work backwards and kind of half close the valve and that the water going in slower then where she did not start, she would be bound, the platform itself would bind against the run wheel on either side, and as soon as enough pressure got into her again, she would go up and go to the next stop."

The following question, based on the testimony of the same witnesses, was asked of the expert Mueller:

"An operator starts the elevator, but don't go up with it at all. Just gives it a start to go this distance, but instead of going that distance it stops on the way three or four feet or some distance up, stops a little while, just for a very short period, and then starts up again and goes higher. It may stop again and start up or go clear up without any operator handling or having anything to do with the elevator. Now, what in your judgment is that due to?"

The witness answered as follows:

"Only I can see the reason only is that the operating valve shifting cable which is on the change valve, what we call the operating valve, that the turn buckle on one side which connects the two cables and the stop buttons on the same side might have been so heavy and loose that the chain works so easy that when it pulls down the turn buckle goes up and that turn buckle is liable to pull that valve around and stop it from itself. I can only see that under those conditions."

The further question was then asked:

"What would cause it to start by itself up again after it stopped? *A.* Because he didn't close off the port entirely."

It will be observed from this evidence that Seyfried customarily pulled the rope and opened up the intake valve and started the elevator on its upward journey, and that the difficulty was that at times the valve would partially close automatically and that such partial closure would result in the irregular motion testified to. It is perfectly obvious that a leak in the intake valve could not account for this motion when the valve was open. Neither could a leak sufficient in size to raise the elevator but a slight distance account for the fact that the elevator descended three feet when a roll of paper was placed on it. Such a movement must be due to the fact that the pressure from above was greater than the fifty-five pounds pressure to the square inch from below, and the further fact that there was an outlet of substantial size through which the water could escape. The plaintiff's experts do not attribute these movements to a leaky valve, but say they were due to an entirely different cause. It is not claimed that this cause had any connection with the injury to the plaintiff.

One further hypothetical question asked of the witness Fischer remains to be noticed. It was:

"Now assuming that this freight elevator of the *Sentinel Company*, the kind that you examined as stated in your testimony, supposing or assuming that that elevator is brought to a standstill when raised up on a level with the wagon from which freight is to be unloaded onto the elevator, to be taken down onto the elevator, to be taken down into the basement, and after having been stopped with the level of the wagon, should raise a few inches above the wagon, what in your judgment is that due to?"

To this question the witness answered: "A leak in the valve." It goes without saying that a failure to close the valve would produce the same result. The expert Fischer so testified.

Taking Buntrock's entire evidence, from a careful reading of it we are at a loss to know whether he meant to testify that Seyfried at any time stopped the elevator at a height even with the wagon and that it thereafter went upward two or three inches of its own motion. He may mean this or he may mean that Seyfried started the elevator and that it stopped at the right height and then raised three inches more. Such movement would be the result of the partial closing of the intake valve according to the uncontradicted testimony. Buntrock testified that he could not see Seyfried after he started the elevator. It is also undisputed that there was an automatic device on the elevator which brought it to a standstill at a point which would be substantially on a level with the platform of a truck placed adjacent thereto in the alley. If Buntrock did mean to testify that Seyfried actually stopped the elevator, the later movement might be due to a leak in the valve or it might be due to the fact that he did not entirely close the valve. Either condition would produce the same result.

The following facts are undisputed: Buntrock would not say how many times he observed this particular movement. This might mean that he saw it once or more than once. It did not occur at all for two or three weeks before the plaintiff was injured. Rauschenberger did not observe any abnormal movement of the elevator for more than a month before the injury. The elevator was inspected daily. A new intake valve had been put in place from two to four months before the accident. The life of such a valve is about one year. The intake valve that was in use when plaintiff was injured was thereafter used from six to nine months. During that time no such movement of the elevator occurred. There is no evidence to show that the elevator ever started up of its own motion after the operator had brought it to a standstill, unless

Buntrock intended to so testify. Rauschenberger saw no such movement. We are entirely in the dark as to whether Buntrock had an isolated case in mind, and are confronted with the impossibility of the witness knowing what Seyfried did, as he admits that Seyfried could not be seen after the elevator started upward. No such result having been observed for a considerable length of time before the accident nor for six months thereafter, the conclusion is irresistible that if it did take place it was due to the fact that the valve was not entirely closed when the movement took place. The burden was on the plaintiff to show negligence on the part of the defendant which proximately caused the injury, and this burden has not been met. The action of water under a given pressure is reasonably constant. Proof that at some uncertain time more than two weeks before the injury the elevator made an abnormal movement which might be accounted for by a leak in the valve or another nonactionable cause, and that it made another such movement at the time of the accident, but did not make another one until the valve was changed some six or nine months thereafter, demonstrates clearly that the plaintiff's injury was not due to this cause. Whether it was due to the failure of Seyfried to entirely close the valve or to the mistake of the plaintiff in pulling the wrong rope, as defendant's evidence tends to show, is immaterial. It is not a reasonable inference, or even a reasonable conjecture, to draw from the evidence that the movement on the morning of the accident was due to a leaky valve. There is plenty of evidence in the case tending to show that the elevator acted abnormally when the intake valve was opened up. There is no testimony to show that such abnormal action was responsible for the accident or had anything to do with it. There is no evidence which would warrant a jury in finding that there was any abnormal action when the intake valve

was closed. We think the court should have directed a verdict for the defendant because the proof failed to show actionable negligence on its part.

*By the Court.*—The judgment is reversed, and the cause is remanded with directions to dismiss the complaint.

SIEBECKER, J., took no part.

KERWIN, J. I concur in the reversal of the judgment below, but not in the dismissal of the complaint. I think the cause should be remanded for a new trial.

TIMLIN, J., dissents.